UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

- - - - - - - - - - - - - - - - - -
MEMBERS OF THE BEEDE SITE GROUP,    )
                                    )
          Plaintiffs,               )
                                    )
     v.                             )     C.A. No. 09-370 S
                                    )
FEDERAL HOME LOAN MORTGAGE CORP.,   )
ET AL.,                             )
                                    )
          Defendants.               )
- - - - - - - - - - - - - - - - - -

In the matter of:   Motion to Dismiss and/or Motion for Summary
                    Judgment of Defendant Shaw's Service Station,
                    LLC.


<u>MEMORANDUM AND ORDER</u>

William E. Smith, United States District Judge.

     This matter is before the Court on the Motion to Dismiss
and/or Motion for Summary Judgment brought by Defendant Shaw's
Service Station, LLC (hereinafter "Shaw's"), alleging that the
claims against it must be dismissed because it is not liable for
the acts of its predecessor, also known as Shaw's Service Station.
Because both Shaw's and Plaintiffs have submitted additional
materials for the Court's review, and because Shaw's has already
filed a responsive pleading to the Amended Complaint,[1] the Court
will consider Shaw's motion only as one for summary judgment,
pursuant to Fed. R. Civ. P. Rule 56.  Plaintiffs object to Shaw's
Motion for Summary Judgment because there are disputes over key

_____

     [1] Shaw's answered the Amended Complaint on April 8, 2010 (ECF
No. 284).

factual issues, and also because, they assert, more discovery is necessary.  While the Court concurs that the record is thin for summary judgment, the Court notes that Plaintiffs have not presented any affidavit addressing their need to obtain additional essential facts, as required by Fed. R. Civ. P. 56(f).  Consequently, the Court will necessarily make do with the evidence before it.

This large-scale CERCLA[2] litigation concerns government-directed environmental clean-up efforts at a superfund site in Plaistow, New Hampshire ("the Site").  Plaintiffs are members of an association formed in connection with the Beede Waste Oil Superfund Participation Agreement of August 1, 2007.  Plaintiffs have undertaken remediation efforts at the Site and seek contribution and other costs from Defendants, who were allegedly involved in the disposal of hazardous materials at the Site between the 1920s and 1994, when operations ceased.  Shaw's predecessor allegedly generated and then disposed of waste oil at the Site between 1982 and 1986.  Although Defendant Shaw's purchased its predecessor's business in 1999, Defendant argues that it purchased only certain limited assets and therefore bears no responsibility for the costs of environmental remediation for dumping that took place before 1999.  For reasons explained below, the Court denies Shaw's motion.

---

[2] Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq.

I.   Standard of Review

When ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party.  Cont'l Cas. Co. v. Canadian Univ. Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991). Once this is done, Rule 56(c) requires that summary judgment be granted if there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law.  A material fact is one affecting the lawsuit's outcome.  URI Cogeneration Partners, L.P. v. Bd. of Governors for Higher Educ., 915 F. Supp. 1267, 1279 (D.R.I. 1996).   Factual disputes are genuine when, based on the evidence presented, a reasonable trier of fact could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The ultimate burden of persuasion is on the moving party to show that the undisputed facts entitle it to summary judgment as a matter of law.  Jaroma v. Massey, 873 F.2d 17, 20 (1st Cir. 1989).  The moving party must show that "there is an absence of evidence to support" the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

If that burden is met, the nonmoving party cannot rest on its pleadings, but must "set forth specific facts demonstrating that there is a genuine issue for trial" as to the claim that is the subject of the summary judgment motion.  Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988).

II.  Background

Robert Shaw, one-time mayor of Manchester, New Hampshire, was the sole proprietor of the automobile service station at a busy intersection of that city dating back to the 1960s.  In addition to servicing cars and selling gasoline, Mr. Shaw also ran a small market and a sandwich shop at the same location.[3]  In 1976, Jean Poulin was hired as a mechanic, eventually working his way up to a position of more responsibility.

Plaintiffs have produced manifests from Beede Waste Oil Corporation indicating that Shaw's Service Station or Shaw's Mobil of Webster Street in Manchester generated waste motor oil brought to the Site in 1982 (500 gallons), 1983 (500 gallons) and 1986 (400 gallons).  Plaintiffs believe that further investigation will establish that the gas station made additional regular disposals at the Site during the pertinent time period.[4]

In 1999, Shaw sold off some of his business assets, including the service station trade name, to Jean Poulin, who continued to operate the service station at the same intersection.[5]  The market and sandwich shop were not included in the sale; nor was the real estate.  In 2001, Poulin reorganized the business to form Shaw's

---

[3] 111 Webster Street.

[4] Discovery has not yet closed in this lawsuit.

[5] At some point, Shaw's moved to its present location, 525 Hooksett Road, Manchester.

Service Station, LLC, the named Defendant in the present lawsuit.

III. Successor Liability

Before getting into the details concerning the sale of the business from Shaw to Poulin, it would be helpful to summarize the equitable doctrine of successor liability.  Generally speaking, at common law, when a corporation acquires the assets of another corporation, it does not acquire its liabilities.  <u>Bielaqus v. EMRE of New Hampshire Corp.</u>, 826 A.2d 559, 564 (N.H. 2003).  However, there are exceptions to this general rule.  <u>Kleen Laundry & Dry Cleaning Servs., Inc. v. Total Waste Mqt. Corp.</u>, 817 F. Supp. 225, 230 (D.N.H. 1993).  Federal courts have been especially receptive to imposing successor liability in the context of CERCLA lawsuits.  The Massachusetts District Court explained this reasoning:

> Expenses can be borne by two sources: the entities which had a specific role in the production or continuation of the hazardous condition, or the taxpayers through federal funds.  CERCLA leaves no doubt that Congress intended the burden to fall on the latter only when the responsible parties lacked the wherewithal to meet their obligations.
> Congressional intent supports the conclusion that, when choosing between the taxpayers or a successor corporation, the successor should bear the cost. Benefits from use of the pollutant as well as savings resulting from the failure to use non-hazardous disposal methods inured to the original corporation, its successors, and their respective stockholders and accrued only indirectly, if at all, to the general public.  We believe it in line with the thrust of the legislation to permit – if not require – successor liability under traditional concepts.

<u>In re Acushnet River & New Bedford Harbor Proceedings re Alleged
PCB Pollution</u>, 712 F. Supp. 1010, 1013-14 (D. Mass. 1989) (internal
quotation marks and citation omitted).

In CERCLA cases, a successor corporation may be found liable
for its predecessor's obligations "where factually justified."
<u>Kleen Laundry</u>, 817 F. Supp. at 230.  Successor liability has been
enforced when the successor agrees, even implicitly, to assume the
liabilities, or if the transaction is determined to be fraudulent.
More relevant to the present case, successor liability may be found
if the transaction is determined to be a <u>de facto</u> merger, or if the
successor is a "mere continuation" of its predecessor.  <u>Id.</u> at 230.
To analyze these exceptions, the Court must look beyond the labels
used to describe a transaction and instead focus on the substance.
<u>Id.</u> at 230.  While there is some disagreement amongst the federal
circuits as to whether a uniform federal law should be used to
define successor liability, the First Circuit has instructed courts
to "apply state law 'so long as it is not hostile to the federal
interests animating CERCLA.'"  <u>United States v. Davis</u>, 261 F.3d 1,
54 (1st Cir. 2001) (quoting <u>John S. Boyd Co. v. Boston Gas Co.</u>, 992
F.2d 401, 406 (1st Cir. 1993)).

A.   A <u>De Facto</u> Merger

The New Hampshire Supreme Court endorsed <u>Kleen Laundry</u>'s test
for <u>de facto</u> merger in <u>Bielagus</u>, 826 A.2d at 565-66, explaining
that "[t]he bottom-line question is whether each entity has run its

own race, or whether there has been a relay-style passing of the baton from one to the other."   See also J.G.M.C.J. Corp. v. C.L.A.S.S., Inc., 155 N.H. 452, 457, 924 A.2d 400, 405 (2007).

A de facto merger has four tell-tale aspects: (1) a continuation of the enterprise of the seller corporation, including a continuity of management, personnel, physical location, assets and business operations; 2) a continuity of shareholders, resulting from the successor using its own stock to pay off the predecessor; 3) a speedy dissolution of the predecessor corporation; and 4) an assumption, by the successor, of the predecessor's obligations as necessary for the uninterrupted continuation of normal business operations. Kleen Laundry, at 230-231.  While these factors favor the finding of a de facto merger, no one factor is necessary or sufficient to that finding. Acushnet River, 712 F. Supp. at 1015.

B.   "Mere continuation" Exception

A successor corporation is a "mere continuation" of its predecessor when only one corporation remains after the transaction, and the stock, stockholders and directors are the same. Bielagus, 826 A.2d at 567.  The Kleen Laundry Court endorsed a broader "substantial continuity" test as better suited to furthering the goals of CERCLA.   817 F. Supp. at 231. The "substantial continuity" test relies on the evaluation of several factors:

    (1)  retention of the same employees;
    (2)  retention of the same supervisory personnel;

    (3)   retention of the same production facilities in the
          same location;
    (4)   production of the same product;
    (5)   retention of the same name;
    (6)   continuity of assets;
    (7)   continuity of general business operations; and
    (8)   whether the successor holds itself out as the
          continuation of the previous enterprise.

<u>Kleen Laundry</u>, 817 F. Supp. at 231.  However, the New Hampshire Supreme Court in <u>Bielagus</u> refused to adopt the broader "substantial continuity" test, explaining that:

> [T]his expansive theory of successor liability, however valid in federal courts, is grounded upon public policies that are not applicable to traditional commercial and contract law, which are governed by predictability of results and the intentions of the parties.

826 A.2d at 569.  The New Hampshire Supreme Court indicates its belief that the broader test is appropriate in the federal, CERCLA context.  Nonetheless, this is the precise doctrinal split that the First Circuit faced in <u>United States v. Davis</u>, before ultimately endorsing Connecticut's "mere" test, rather than the federal "substantial" test.  261 F.3d at 54 ("We see no evidence that application of state law to the facts of this case would frustrate any federal objective.  Connecticut's 'mere continuation' test thus is the correct test for determining successor liability for the hazardous waste disposed by Gar.").  Bearing in mind these precepts, as well as the criteria pertinent to the <u>de facto</u> merger test, the Court will now more closely examine the details of the Shaw's asset purchase transaction.

III. The Shaw's Sale

Shaw's asserts that it purchased only a part of its predecessor's assets: the trade name and some equipment related to the car repair business.  It did not purchase the petroleum tanks, the gas pumps, the real property, or any of the assets connected with the market or the sandwich shop.  Shaw's has produced a 1999 promissory note to the Bank of New Hampshire for $48,000; an equipment appraisal list, also from 1999, including equipment valued at $19,155; and another list of equipment, labeled "Equipment List Not in Appraisal List," tallied up at $16,065.[6] Shaw's has not located or produced an asset purchase agreement or a bill of sale.  In an affidavit, Poulin states that he worked for Robert Shaw as a mechanic, not a manager.  After Mr. Shaw sold the repair business to Poulin, Mr. Shaw retired and played no further role in the repair business.  Poulin also states that Mr. Shaw paid off his creditors following the asset purchase sale, and Poulin never paid anything else to any of Mr. Shaw's creditors.  In 2001, Poulin formed an limited liability company to operate as Shaw's Service Station, LLC.

Shaw's has also submitted the 2011 affidavit of Attorney Roy Tilsley, who reviewed papers documenting the asset purchase sale for Poulin in 1999, although he did not prepare those documents or represent Poulin at the closing.  Tilsley now recalls that the

---

[6] These equipment lists may have been attached to the promissory note, but the note does not reference or incorporate any list.

asset purchase agreement didn't include equipment from Robert Shaw's gasoline sales, sandwich shop or convenience store businesses. Additionally, Tilsley recalls that the asset purchase agreement stated that Poulin was not assuming any of Robert Shaw's liabilities. Tilsley also describes a lease agreement between Robert Shaw and Poulin for three automotive service bays located at 111 Webster Street.

Plaintiffs, for their part, have discovered and produced documents allegedly submitted by Poulin to the bank as part of his 1999 loan application. In those documents, Poulin characterizes his take-over of the automotive repair business as a seamless transition that would barely be noticed by Robert Shaw's loyal customer base. Unfortunately for Poulin today, much of the way he characterized his takeover of the service station business in 1999 supports a finding that Shaw's was very much a continuation of its predecessor. For example, a document labeled "Business Proposal For Shaws Service Station," which seems to have been prepared in connection with Poulin's bank loan application, states (verbatim):

Business Philosophy:

To provide the motoring public, with the finest service, and developing the methods to save our customers money. . . . I feel that the service record of the present management could be continued without any disruption of customer base & commercial account already established.

. . . .

Management Background:

Overall management will be directed by myself Jean Poulin who has been employed in this same establishment since 1976 starting as a gas attendent, furthering to a wrecker driver.  Since 1979 becoming an apprentice in the field of automotives I have become very knowledgable in the automobile repair business[.]  Since 1990 I have been primarily in the position of management overseeing the public relations & satisfaction of customers needs.

Business Goals and Objectives:
Short term of goals would be to continue the current operation of established business, to pay off the full amount of note owed to the bank. Long term would be to continue the operation of business expanding in the other establishment in place being gas station and small deli already at this location.

(Ex. A to Aff. of Curtis A. Connors, ECF No. 489-3, attached to Pls.' Mem. in Support of its Obj.)  According to the lease terms, Mr. Shaw and Poulin agreed that Poulin would keep the same phone number that had been associated with the service station for many years, and that "money collection . . . will continue as is." (Ex. D to Aff., ECF No. 489-6.)  Plaintiffs have also submitted a letter, dated June 8, 1999, from Mr. Shaw "To whom this may concern," which seems also to have been part of the bank loan application packet.[7]  In this letter, Mr. Shaw writes,

The time has come for me to pass my auto-repair business onto someone who will serve customers, in the same manner I have, for all these years.

. . . .

All proceeds from Mr. Poulin's loan that are paid to me (Robert Shaw), will be used to close all station

---

[7] The Court reaches this conclusion because, in the letter, Mr. Shaw offers to co-sign Poulin's loan.

accounts, and the combined business liability of Mr. Poulin and I will not increase due to any loan.

The only change anticipated, is the opportunity for Mr. Poulin to own his own business and to have a greater share, for his hard work.

(Ex. E to Aff., ECF No. 489-7.)

IV.  Analysis

Faced with the compelling evidence of the continuity of the enterprise before and after the asset sale transaction, which the Court must view in a favorable light, the Court concludes that Defendant has failed to meet its burden of demonstrating an absence of genuine issues of material fact which would entitle it to summary judgment.  <u>Stepanischen v. Merchants Despatch Transp. Corp.</u>, 722 F.2d 922, 929 (1st Cir. 1983).  Based on the evidence presented, the Court does not conclude with certainty that the new Shaw's was created by a <u>de facto</u> merger with its predecessor, or that it was a mere continuation of the previous operation. However, the Court does conclude that there is a genuine, unresolved dispute concerning Shaw's status that cannot be settled at the summary judgment juncture, at least with the facts thus far available.

Analyzing the Shaw's transaction in light of the <u>Kleen Laundry</u> indicia of a <u>de facto</u> merger: (1) it appears that there was a continuation of many aspects of the service station, including location, assets and business operations.  As for continuity of management, Poulin asserts now that he was not a manager prior to

12

the asset sale.  However, Plaintiffs have pointed out that he characterized his responsibilities as managerial in his 1999 bank loan application.  At any rate, for an operation as small as Shaw's, this dispute is not particularly significant.  The Court has heard no evidence about stock or shareholders, so concludes that prong (2) is probably not relevant to the analysis.  As to prong (3), the "speedy dissolution of the predecessor corporation," after the asset sale: Mr. Shaw's lease of his automotive repair bays to Poulin, along with his letter to the Bank announcing his intention to pass his business on, both indicate that Mr. Shaw's auto repair business was dissolved, and Poulin's auto repair business was born when the sale took place.  The fourth prong of a de facto merger calls for an analysis of whether or not Shaw's assumed the obligations of its predecessor as necessary for continued operations.  The lease indicated that money collection would continue as is; while Mr. Shaw's letter to the bank stated that he would use proceeds from the sale to close all station accounts, but also references "the combined business liability of Mr. Poulin and I."  Poulin states that Mr. Shaw paid off his creditors after the asset sale and that Poulin never paid anything further to any of Mr. Shaw's creditors.

Nonetheless, the overall impression created by the documents submitted by Plaintiffs is that the business operations continued as before, same name, same location, same manager, same phone

13

number, and same customers, but with Poulin as owner instead of Mr. Shaw.

The "mere continuation" test is a minimal one: only one corporation remains after the transaction, and the stock, stockholders and directors are the same. <u>Bielaqus</u>, 826 A.2d 567. As stated above, the Court finds that only one automotive repair enterprise remained after the transaction, but that there were no stock, stockholders or directors to identify.

After reviewing the law and the materials submitted by the parties, the Court concludes that Defendant Shaw's has not established that it is entitled to summary judgment as a matter of law on the issue of successor liability.

V.   Conclusion

For the reasons stated above, this Court denies Defendant Shaw's Service Station, LLC's motion for summary judgment. It is so ordered.


<u>/s/ William E. Smith</u>
William E. Smith
United States District Judge
Date: March 21, 2011

14