```
                   UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW HAMPSHIRE
```

_____
                                      )
MEMBERS OF THE BEEDE SITE GROUP,      )
                                      )
            Plaintiff,                )
                                      )
      v.                              )    C.A. No. 09-370-WES
                                      )
FEDERAL HOME LOAN,                    )
MORTGAGE CORP., et al.,               )
                                      )
            Defendants.               )
_____)

**OPINION AND ORDER**

This case relates to the apportioning of costs arising from an environmental clean-up effort on contaminated property in Plaistow, New Hampshire (the "Beede Site"). Plaintiff is a group of the companies that deposited the lion's share of hazardous materials on the site. Plaintiff entered into a consent decree with the United States Environmental Protection Agency (the "EPA") and the New Hampshire Department of Environmental Services ("NHDES"), in which it agreed to perform the environmental remediation. Plaintiff in turn sued over 200 defendants under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") for contribution to this effort. All but two defendants, BSS Realty Trust ("BSS Realty") and Senter Transportation Co., Inc. ("Senter" and, together with BSS Realty, "Defendants"), have settled and been

dismissed from the suit.[1]  Both Plaintiff and Defendants now move for summary judgment, with Plaintiff moving with respect to liability only.

I.  Facts

The Beede Site was the location of oil-related operations, including waste oil processing and re-sale, fuel oil sale, and contaminated soil processing into cold-mix asphalt, in addition to antifreeze recycling and other related industries, from the 1920s until operations ceased in approximately 1994.  BSS Realty is the former owner of property located at 65 Hale Street, Haverhill, Massachusetts (the "BSS Site"), where Senter was a long-time tenant.  Senter operated a fleet of 15-20 trucks that hauled gas and oil in tankers.  As part of its regular maintenance of its trucks, Senter changed the oil in its trucks and stored the discarded oil in a 500 gallon storage tank on the BSS Site.  (Senter Dep. 39:17-40:5, 41:13-42:2, Feb. 15, 2012, ECF No. 702-05.)  Between 1982 and 1986, Senter contracted with Beede Waste Oil Corp. ("Beede Corp.") on at least eleven occasions to empty the waste oil from the storage tank.  (Ex. C to Aff. of Curtis A. Connors, Esq. (BSS Realty's Resp. to

---

[1] At the time these motions were filed, Salisbury Building Supply, Inc. and Salisbury Square Service, Inc. (the "Salisbury Defendants"), were also parties to this action, but they have since been dismissed.

Interrog.), Interrog. 4, ECF No. 702-6; Ex. I to Aff. of Curtis A. Connors, Esq., ECF No. 702-12.)

Following decades of occupancy and use of the BSS Site by Senter, BSS Realty leased the BSS Site to Salvucci Transportation, a trucking and demolition business. In May 1990, during Salvucci Transportation's tenancy on the BSS Site, BSS Realty contracted with Beede Corp. to transport 500 gallons of waste oil from the BSS Site. (Ex. E to Aff. of J. Mark Dickison, ECF No. 701-5.) In July 1990, BSS Realty discovered a "foreign substance" in a mound of soil during a visit to the BSS Site during Salvucci Transportation's tenancy. (BSS Realty's Resp. to Interrog., Interrog. 12.) The Massachusetts Department of Environmental Protection sent a letter requiring BSS Realty to transport the contaminated soil from its site. BSS Realty filled out the required Uniform Hazardous Waste Manifests and paid for the "Virgin Petroleum Contaminated Soil" to be transported to the Beede Site on two occasions. (Exs. C & D to Aff. of J. Mark Dickison, ECF Nos. 701-3 & 701-4.) Prior to the second disposal, which occurred on March 29, 1991, BSS Realty contracted with the New England Environmental Technologies, Corporation ("NEET") to test the soil on the Beede Site. (Ex. G to Aff. of Curtis A. Connors, Esq. (Invoice from NEET and Testing Results), ECF No. 702-10.) On March 25, 1991, the "Beede Environmental Serv Team" received sampling results

3

showing elevated levels of arsenic, cadmium, lead, selenium and silver in the sampled soil.  Id.

The EPA and the NHDES took initial response actions at the Beede Site and pursued potentially liable parties, demanding that they perform environmental remediation at the Beede Site. In 2004, the EPA estimated the remedial cost would be $48,000,000.  Several potentially responsible parties organized the Beede Site Group and, without admitting any liability, entered into the Beede Waste Oil Superfund Site RD/RA Consent Decree, requiring each signatory to (1) reimburse the United States and the state of New Hampshire for clean-up costs; and (2) perform all further cleanup work.  Plaintiff's expert estimates that clean-up costs would amount to $74,163,000. Plaintiff now seeks contribution from the other parties responsible for polluting the Beede Site.

II. Standard

Summary judgment is appropriate when, viewing the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009).  "A genuine issue of fact exists where the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Taylor, 576 F.3d at 24 (internal citation and quotation marks omitted).

The moving party bears the initial burden of demonstrating a lack of a material issue of fact, which shifts the burden to the non-moving party.  As the First Circuit Court of Appeals has explained:

> The moving party bears the initial burden of informing the trial court of the basis for his motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact.  Once the moving party has accomplished this feat, the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor. As a general rule, that requires the production of evidence that is significant[ly] probative.  If the nonmovant fails to make this showing, then summary judgment is appropriate.

Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) (internal citations and quotation marks omitted).

III. CERCLA Claims

CERCLA empowers the federal government and states to initiate environmental remediation projects and recoup the expenses associated with these efforts.  Property owners are strictly liable for disposing of the hazardous materials on their properties, but they may then seek reimbursement from other owners and polluters – the so-called "potentially responsible parties" ("PRPs").   42 U.S.C. § 9607(a) ("Section

107"). Section 107 generally authorizes the United States, a state, or "any other person" to seek reimbursement for all remedial costs associated with hazardous materials on a property. Id. Section 113(f) of CERCLA allows PRPs to seek contribution from other PRPs. 42 U.S.C. § 9613(f). Specifically, Section 113(f)(3) provides a right of contribution to PRPs that have settled their CERCLA liability with a state or the United States through an approved settlement. Id.

CERCLA provides for strict liability under §§ 107 & 113 for four categories of persons: (1) owners or operators; (2) past owners or operators; (3) transporters or (4) arrangers. 42 U.S.C. § 9607(a); see also United States v. Davis, 261 F.3d 1, 28-29 (1st Cir. 2001) (citing Acushnet Co. v. Mohasco Corp., 191 F.3d 69, 74 (1st Cir. 1999)). An arranger is defined as:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility . . . owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3); see also Am. Cyanamid Co. v. Capuano, 381 F.3d 6, 23 (1st Cir. 2004). Any of these persons will be liable for contribution if "[(1)] a release or threatened release of a hazardous substance occurred in defendant's facility; [(2)] plaintiff incurred in response costs because of the release or threatened release; and [(3)] the costs were

6

necessary costs of response in accordance with the [National Contingency Plan]." Esso Standard Oil Co. (Puerto Rico) v. Rodriguez-Perez, No. CIV. 01-2012(SEC)(J), 2004 WL 2238894, at *5 (D.P.R. Oct. 1, 2004) (citing Acushnet, 191 F.3d at 75).

BSS Realty and Senter contest that they are responsible for the release of any hazardous substances.  Insofar as they are only alleged to have arranged for the transportation of waste oil and petroleum contaminated soil, these Defendants claim that the material they transported to the Beede Site is excluded from the definition of "hazardous substance" under CERCLA. CERCLA's definition of hazardous substance expressly excludes petroleum, stating in pertinent part:

> The term [hazardous substance] does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C. § 9601(14) (the "Petroleum Exclusion"). The Petroleum Exclusion removes from the coverage of CERCLA substances that are inherent in petroleum or added to it during the refining process, but not hazardous substances that are added to, or mixed with, petroleum during or after its use. Cariddi v. Consol. Aluminum Corp., 478 F. Supp. 2d 150, 154 (D. Mass. 2007).  Further, soil that has been contaminated by nothing

7

other than unadulterated petroleum has been held to qualify for the Petroleum Exclusion.  See Wilshire Westwood Assocs. v. Atlantic Richfield Corp., 881 F.2d 801, 804 (9th Cir. 1989); S. Pac. Transp. Co. v California, 790 F. Supp. 983, 984 (C.D. Cal. 1991).

Plaintiff argues that the Petroleum Exclusion does not apply.  Noting that "CERCLA liability may be inferred from the totality of the circumstances [and] it need not be proven by direct evidence," Tosco Corp. v. Koch Indus., Inc., 216 F.3d 886, 892 (10th Cir. 2000) (citations omitted), Plaintiff contends that the oil disposed of at the Beede Site would necessarily have acquired contaminants during use in an automobile engine and from the construction debris with which it mixed on the BSS Site.  (See Aff. of Peter Nangeroni, ECF No. 707-4.)

Plaintiff and Defendants agree that unadulterated petroleum and petroleum that is mixed with soil that does not contain any hazardous substances falls within the Petroleum Exclusion.  However, "[t]he exclusion is inapplicable when . . . indigenous components are found in excess of the amounts that would have resulted from the refining process or when they are added to the petroleum product during or after use." Esso, 2004 WL 2238894, at *10.  The amount of the hazardous substance that contaminates the petroleum is irrelevant for purposes of determining

8

liability – even a de minimis amount can lead to liability. United States v. Alcan Aluminum Corp., 990 F.2d 711, 717, 720 (2d Cir. 1993).

The oil shipments here can be broken down into two categories: the waste oil that was shipped from the storage containers on the BSS Site; and the petroleum contaminated soil that BSS Realty sent to the Beede Site. In cases regarding used motor oil, courts have accepted circumstantial evidence to conclude that such oil contains contaminants that are hazardous substances. In such cases, courts have placed the burden on the party claiming the Petroleum Exclusion to show that the deposited oil did not contain contaminants. See Esso, 2004 WL 2238894, at *10; Dartron Corp. v. Uniroyal Chem. Co., 917 F. Supp. 1173, 1184 (N.D. Ohio 1996) (holding a PRP liable for dumping waste oil because it failed to test the oil prior to shipping to prove that the oil did not contain hazardous materials). Here, as in Esso, Plaintiff's expert concluded that waste oil would typically include "metals, acids, post-refining additives and additive byproducts, gasoline combustion by products [sic] (from engine blowby) and possibly antifreeze. Lead, in particular, is a hazardous substance that would have accumulated in used oil to levels in excess or normal lead levels in virgin petroleum." (Aff. of Peter Nangeroni ¶ 7.) This list is representative of the contaminants found at the

9

Beede Site.  Further, "The Environmental Protection Agency <u>presumes to be hazardous</u> wastes from the interior of a tank that held a petroleum product." <u>Dartron Corp.</u>, 917 F. Supp. at 1184 (citing <u>United States v. West. Processing Co.</u>, 761 F. Supp. 713, 720-22 (W.D. Wash. 1991); 40 C.F.R. § 279.10) (emphasis in original).  Therefore, in light of Plaintiff's proffered evidence, the burden falls to BSS Realty and Senter to show that the waste oil they deposited did not contain these materials. <u>See</u> <u>id.</u> (shifting the burden of proof to a PRP because the types of contaminants at a CERCLA site were characteristic of the waste oil placed there by the PRP).

The result here is the same as in <u>Esso</u>, 2004 WL 2238894, at *10, and <u>Dartron Corp.</u>, 917 F. Supp. at 1184.  The evidence before the Court establishes that the normal use of engine oil adds hazardous substances that do not fall within the Petroleum Exclusion; Defendants provided no evidence that the petroleum shipped from the BSS Site did not contain the listed contaminants; and therefore summary judgment is appropriate for Plaintiff against both Defendants with respect to liability for shipping the waste oil from the storage tanks.

The result is different with respect to the shipments of petroleum contaminated soil.  Plaintiff has made no showing regarding the source of the oil contaminating the soil.  In each of the cases discussed above, which place the burden on the PRP

10

to demonstrate that the petroleum did not contain contaminants, the party seeking contribution first showed that it was waste oil, and the court concluded that used engine oil contains contaminants.  Plaintiff here has made no preliminary showing that the petroleum products were used and contaminated with hazardous substances; therefore the PRP Defendants have no burden of proving the purity of the oil in order to take advantage of the Petroleum Exclusion.  See Foster v. United States, 926 F. Supp. 199, 205-06 (D.D.C. 1996) (declining to place the burden of proving the absence of any contaminants on the party claiming the Petroleum Exclusion because the plaintiff failed to produce facts that showed that the petroleum was contaminated with hazardous substances).

Moreover, as in Foster, the record is devoid of any indication that the soil shipped to the Beede Site by BSS Realty contained anything other than pure petroleum.  Indeed, Bernard Senter, the owner of both Senter and BSS Realty, stated in his deposition testimony that he did not know what was contained in the soil he sent to the Beede Site.  (Senter Dep. 88:6-89:14.) Certain soil at the Beede Site was tested in 1991 and was found to contain hazardous materials, but nothing proves that the soil tested was the soil transported to the Beede Site.  The question was never posited to Mr. Senter.  It remains for a jury to decide whether the soil that was tested was the same soil that

11

was shipped to the Beede Site, and summary judgment is denied with respect to these shipments.

IV. State Law Claims

Plaintiff also filed actions for contribution under New Hampshire environmental laws. N.H. Rev. Stat. 147-B:10; N.H. Rev. Stat. 507:7-g. While these laws do not contain an exclusion from the definition of hazardous materials for petroleum, Defendants moved for summary judgment on these claims on other grounds. Defendants argue that (1) Plaintiff's federal claims preempt its state law claims; (2) Beede Corp. was an intervening third party whose actions relieve Defendants of liability; (3) "right, title and interest" to the disposed materials passed to Beede Corp., so Section 382-A:2-401(2) of the New Hampshire Uniform Commercial Code relieves Defendants of liability for harm done by the materials; and (4) the doctrine of laches precludes recovery.

Plaintiff's § 113 claim under CERCLA preempts its state law claims. Plaintiff concedes that if the Petroleum Exclusion does not apply, and Defendants are liable under CERCLA, then its federal cause of action would preempt its cause of action under state law. Plaintiff essentially argues that if it loses its argument on the applicability of the Petroleum Exclusion, state law gives back an avenue for recovery that Congress took away.

12

"CERCLA could preempt state law in one of three ways: (1) Congress expressly indicated that CERCLA preempts state law; (2) CERCLA is a comprehensive regulatory scheme such that it creates a reasonable inference that the state cannot supplement it; or (3) state law directly conflicts with CERCLA." Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 138 (2d Cir. 2010) (citing Cal. Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 280–81 (1987)).

This is an example of state law conflicting directly with federal law. CERCLA provides an exclusion from liability that state environmental law does not. All of Plaintiff's claims for contribution arise from response costs it incurred under CERCLA, as Plaintiff itself asserts, so there are no state law claims that do not directly conflict with CERCLA. The Second Circuit Court of Appeals has addressed this question directly, stating:

> Section 113 is intended to standardize the statutory right of contribution and, in doing so, avoid the possibility of fifty different state statutory schemes that regulate the duties and obligations of non-settling PRPs who might be viewed as tortfeasors under the law of any particular state. Based on the text, § 113 was intended to provide the only contribution avenue for parties with response costs incurred under CERCLA.

Id.

Plaintiff notes that there is no equivalent to the Petroleum Exclusion under New Hampshire law, so it is possible to be liable under state law, but not under CERCLA. Therefore,

13

according to Plaintiff, CERCLA does not preempt state environmental law, but "supplements" it. CERCLA is not a comprehensive regulatory scheme that occupies the entire field of environmental remediation. Bedford Affiliates v. Sills, 156 F.3d 416, 426 (2d Cir. 1998), overruled on other grounds by W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc., 559 F.3d 85, 91 (2d Cir. 2009). "But what 'supplements' a federal law is sometimes in the eye of the beholder. If a state law gives something that the federal law explicitly takes away, that is not a supplement but a conflict." Appleton Papers Inc. v. George A. Whiting Paper Co., 901 F. Supp. 2d 1113, 1115-16 (E.D. Wis. 2012). Ultimately, Congress made a political determination to exclude transporters of petroleum from liability under CERCLA, and holding such entities liable under state law for costs that were incurred under CERCLA would undermine CERLCA's scheme for apportioning environmental clean-up costs. See Pac. Capital Bank, N.A. v. Connecticut, 542 F.3d 341, 351 (2d Cir. 2008) (holding that issue preemption by conflict exists when "compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." (quoting United States v. Locke, 529 U.S. 89, 109 (2000) (internal quotation marks omitted)). Because CERCLA preempts Plaintiff's state law claims, the Court grants summary judgment

to Defendants on Plaintiff's state law claims and need not address Defendants' remaining summary judgment arguments.

V.  Salisbury Defendants

Plaintiff also moved for summary judgment with respect to its claims against the Salisbury Defendants. Since that time, however, all parties have stipulated to the dismissal of the Salisbury Defendants, (ECF No. 713), and Plaintiff's motion with respect to them is denied as moot.

VI. Conclusion

For the reasons stated above, Plaintiff's motion for partial summary judgment is GRANTED with respect to Defendants' liability for shipments of waste oil from the BSS Site. Plaintiff's motion for partial summary judgment is DENIED with respect to all shipments of petroleum contaminated soil and with respect to the Salisbury Defendants. Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's state law claims only and DENIED with respect to Plaintiff's CERCLA claims.

IT IS SO ORDERED.

*/s/ William E. Smith*
William E. Smith
United States District Judge
Date:  September 5, 2013

15